IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**THOMAS J. WINKLER,**

    Plaintiff,

vs.                                                             Case no. 3:05cv288-RS-EMT

**PRINCIPAL LIFE INSURANCE COMPANY,**

    Defendant.

_____/


## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

    Before the Court are cross-motions for summary judgment (Docs. 31-1 and 33) and their responses (Docs. 43 and 44).

### I. FACTS

    Plaintiff Thomas Winkler was employed as a financial planner with First Command Financial Planning, Inc. ("First Command") beginning March 1997.  During his employment, Winkler was covered by a Group Long Term Disability Policy (the "Policy") that was issued, insured, and administered by Defendant Principal Life Insurance Company ("Principal Life").

    In June 2002, while still employed by First Command, Winkler was diagnosed with neuromyelitis optica, more commonly known as Devic's Syndrome.[1]  Winkler applied for disability benefits in May 2003.  Principal Life granted Winkler's application for disability benefits and considered him to be "disabled" as of June 2002, the date of diagnosis.  Principal Life paid benefits to Winkler beginning December 1, 2002, the date

---

[1] Devic's Syndrome is a rare autoimmune, inflammatory disorder of the central nervous system similar to Multiple Sclerosis ("MS").  Unlike MS, however, only the myelin (fatty, protective covering of the nerves) surrounding the spinal cord and optic nerves are affected.  Symptoms of the disorder include fatigue, weakness, numbness, visual impairment or loss, and other sensory disturbances.

1

on which Winkler completed the six-month "elimination period" required by the Policy. Principal Life continued to pay benefits to Winkler for a period of two years. On November 30, 2004, Principal Life terminated Winkler's disability benefits based on its determination that Winkler was no longer "disabled" under the terms of the Policy. In January or February 2005, Winkler appealed Principal Life's decision to terminate his benefits. While the appeal was under review by Principal Life, Winkler commenced this action on July 27, 2005. Principal Life denied Winkler's appeal on March 6, 2006.

The Complaint alleges that Principal Life failed to honor the terms of the Policy by terminating Winkler's long-term disability benefits on November 30, 2004. Winkler contends that from the date of termination until the present, he qualified and continues to qualify for disability benefits. Winkler characterizes Principal Life's decision to deny him benefits as "arbitrary and capricious, . . . an abuse of Defendant's discretion under the [Policy], and [a] derogat[ion] [of his] right to disability benefits under the terms of the [Policy]." (Doc. 1.)

Principal Life disagrees and asserts that on November 30, 2004, the definition of "disability" changed pursuant to the terms of the Policy. Under this new definition of "disability," Principal Life contends that Winkler no longer qualified for disability benefits.

The parties filed cross-motions for summary judgment on March 24, 2006 (Docs. 31-1 and 33) and agree that no issues of material fact are in dispute. Winkler requests that this Court conduct a de novo review of his entitlement to disability benefits under the terms of a 2003 amended policy and enter judgment in his favor; Principal Life urges that this Court concur with its decision to terminate benefits under the terms of a 2002 policy and that even if this Court disagrees with that decision, deference must be afforded its decision to terminate Winkler's benefits inasmuch as that decision was not "arbitrary and capricious." The parties agree that federal jurisdiction is based on the Employee Retirement Income Security Act (E.R.I.S.A.), 29 U.S.C. § 1132(e), and federal question jurisdiction, 28 U.S.C. § 1331.

## II.  DISCUSSION

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)).  "An issue of fact is 'material' if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  Tipton, 965 F.2d at 998 (citing Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356).

  The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S. Ct. at 2512.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993); Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  Thus, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir.1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985)).  However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing Anderson, 477 U.S. at

251, 106 S. Ct. at 2511).

If the movant satisfies its initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted).  Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole."  Tipton, 965 F.2d at 998 (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S. Ct. at 2513 (citing Adickes, 398 U.S. at 158-59, 90 S. Ct. at 1609).  In light of the summary judgment standard, this Court will apply the relevant substantive law to the facts of the case.

**B.  The Substantive Law**

    **1.  The Applicable Policy**

Before this Court can consider the merits of the cross-motions for summary judgment, it must first determine which policy governs Winkler's claim for benefits because the policy delineates the benefits to which Winkler is entitled and the standard of review that the Court should apply to Principal Life's determination of Winkler's eligibility for those benefits.  Two policies are at issue:

(1) the original policy effective January 1, 2002 (the "2002 Policy"); and

(2) the amended policy effective May 1, 2003 (the "2003 Policy").

Winkler urges application of the 2003 Policy to his claim; Principal Life contends that the 2002 Policy governs Winkler's claim.  The definition of "disability" contained in the 2003 Policy is broader and thus more favorable to Winkler than the definition of "disability" contained in the 2002 Policy.

In support of his contention that the 2003 Policy governs his claim, Winkler cites

to decisional law holding that "an ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in effect when the decision to deny benefits is controlling." Klecher v. Metropolitan Life Ins. Co., 2003 U.S. Dist. LEXIS 9572, *14 (S.D.N.Y. 2003) (governing policy was the policy in effect when the plaintiff's claim was considered and denied by the insurance company, not the policy in effect when the plaintiff became disabled) (citations omitted). Because Principal Life denied Winkler benefits in 2004 and rejected his appeal in 2006, Winkler urges application of the later Policy, the 2003 Policy, to his claim. This Court disagrees.

In Klecher, the plaintiff was presumably covered by both the initial policy that was in effect when the plaintiff became disabled *and* the amended policy that was in effect when the claim was denied. The later policy in Klecher can therefore be said to have been "in effect" with respect to the plaintiff. Here, however, Winkler was never covered under the 2003 Policy. The 2003 Policy only covered "Members," defined as "[a]ny AGENT OR INDEPENDENT CONTRACTOR who is a full-time employee of the Policyholder and who regularly works at least 30 hours a week." (Doc. 29:17-18.) The facts are undisputed that following the onset of his disability, Winkler was not *regularly* working at least 30 hours a week. Winkler himself admits that his "work activities have been reduced by about 40%" and that

> following the onset of his disability, [Winkler] has only been able to work 5 to 6 hours per day, 5 days a week . . . He often goes home to rest during a business day due to the fatigue and he is no longer effective in his work after 5 to 6 hours per day. He has good and bad days and on a bad day, [Winkler] spends *even less* time working . . . Further, he rarely participates in Prospecting, a material duty of his occupation, due to extreme fatigue.

(Doc. 30:65 ¶ 13; 34:8.) (Emphasis added). Winkler does not allege in any of his pleadings that he qualified as a full-time employee who regularly worked at least 30 hours a week subsequent to the onset of the disease. Therefore, Winkler was never entitled to benefits under the 2003 Policy. The 2003 Policy was never "in effect" with respect to Winkler. Surely Winkler cannot be suggesting to this Court that one is entitled to benefits under a policy so long as the policy is "in effect" anywhere, any time,

and for anyone, even though the individual applying for benefits is not covered by that policy. Such an argument is logically absurd.

Case law from the circuit to which Winkler cites is clear that "[u]nder ERISA, it is the general rule that . . . an employer has the right to terminate or unilaterally amend the plan at any time." Schonholz v. Long Island Jewish Medical Ctr., 87 F.3d 72, 77 (2d Cir. 1995). Here, both the 2002 and the 2003 Policies permitted Principal Life to amend any or all provisions, "including but not limited to, those in regard to coverage, benefits, and participation privileges" at any time and without the consent of the Member (Doc. 32:17, Ex. 1; Doc. 29-2:25, Ex. A.) "It is clear that when cases such as Schonholz state that an employer may amend a welfare plan under ERISA, the courts mean the employer may amend it . . . to the employee's detriment." Brandi v. Good Lad Co. Long Term Disability Plan, 1998 U.S. Dist. LEXIS 12740, 11-12 (S.D.N.Y. 1998).

It is also clear that when Principal Life awarded and denied benefits to Winkler, it did so under the terms of the 2002 Policy. Under the 2002 Policy, a "Member" is defined as "[a]ny AGENT OR INDEPENDENT CONTRACTED AGENT who is a Full-Time Employee of the Policyholder," where "Full-Time Employee" is defined as "[a]ny person who is regularly scheduled to work for the Policyholder at least 30 hours a week." (Doc. 31:11.) At the time of his disability, Winkler satisfied this definition. When Principal Life advised Winkler in 2004 of the more stringent requirements that he would need to satisfy in order to continue receiving disability benefits, it quoted language from the 2002 Policy although the 2003 Policy was also in effect. (Doc. 32:11-13.) In so doing, Principal Life unambiguously communicated to Winkler its understanding that the 2002 policy governed Winkler's claim.

Both the 2002 and 2003 Policies grant Principal Life

> complete discretion to construe or interpret the provisions of this group insurance policy, to determine eligibility for benefits, and to determine the type and extent of benefits, if any, to be provided. The decisions of the Principal in such matters shall be controlling, binding, and final as between The Principal and persons covered by this Group Policy . . . .

(Doc. 29:27 Art. 9; Doc. 31:19 Art. 9.) The United States Supreme Court and the

6

Eleventh Circuit have held that when a benefit plan grants discretion to an administrator or fiduciary "to determine eligibility for benefits or to construe the terms of the plan," a court must review the administrator's decisions under an "arbitrary and capricious" or "heightened arbitrary and capricious" standard of review. Firestone Tire and Rubber Company v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); Marecek v. BellSouth Servs., Inc., 49 F.3d 702, 705 (11th Cir. 1995). Although Winkler contends that the deferential standards of review are altered when an administrator fails to validly exercise that discretion by, for example, failing to render a timely decision, failing to make a good faith attempt to comply with temporal deadlines, or failing to inform the claimant about the status of his case, Winkler does not allege that Principal Life committed any of these omissions with respect to its determination of the *policy* applicable to Winkler's claim; rather, Winkler asserts only that Principal Life failed to validly exercise its discretion with respect to its decision to *terminate* his benefits. Thus, at least with respect to Principal Life's decision to apply the 2002 Policy to Winkler's claim, the decision was a valid exercise of Principal Life's discretion. That decision is entitled to deference and should be upheld for the reasons already stated. See Randazzo v. Federal Express Corp. Long Term Disability Plan, 2000 U.S. Dist. LEXIS 159, *13 (S.D.N.Y. 2000) (upholding as neither "arbitrary or capricious" defendant's application of one policy over another to plaintiff's claim). Even if Principal Life is not entitled to deference with respect to its decision to construe Winkler's claim under the 2002 Policy, this Court makes a de novo determination that the 2002 Policy *is* the policy which governs Winkler's claim for the reasons already stated.

    **2. Entitlement To Benefits**

This Court next addresses whether Winkler is entitled to disability benefits beyond those already received. Under the 2002 Policy, "disability" is defined as follows:

> **Total Disability; Totally Disabled**
>
> A Member who is not working for wage or profit and solely and directly because of sickness or injury:
>
> a.    during the Elimination Period and the two year period immediately following the Elimination Period, is unable to perform the majority of the material duties of his or

        her normal occupation; and

b.    after completing the Elimination Period and the two year period immediately following the Elimination Period, is unable to perform the majority of the material duties of any occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

**Residual Disability; Residually Disabled**

A Member who is working on a limited or part-time basis and solely and directly because of sickness or injury:

a.    during the Elimination Period and the two year period immediately following the Elimination Period:

    (1)    is unable to perform the majority of the material duties of his or her normal occupation; and

    (2)    is unable to earn more than 80% of his or her Indexed Predisability Earnings; and

b.    after completing the Elimination Period and the two year period immediately following the Elimination Period:

    (1)    is unable to perform the majority of the material duties of any occupation for which he or she is or may reasonably become qualified based on education, training, or experience; and

    (2)    is unable to earn more than 80% of his or her Indexed Predisability Earnings.

(Doc. 31:15-16.)

    After Winkler completed the six-month Elimination Period, Principal Life paid Winkler benefits under the "normal occupation" definition of disability for two years. After completing the Elimination period and the two year period immediately following the Elimination Period, the definition of "disability" changed. Under both the "total disability" and "residual disability" definitions, Winkler was now entitled to benefits only if he was unable to perform the majority of the material duties of *any* occupation for which he was or could reasonably become qualified based on education, training, or experience.

    A thorough review of the administrative record and all evidence submitted by the parties convinces this Court that even under a de novo standard of review, Principal

Life's decision to terminate Winkler's benefits on November 30, 2004, was the correct decision. Winkler himself fails to allege that he ever was "unable to perform the majority of the material duties of any occupation for which he . . . is or may reasonably become qualified based on education, training, or experience." In fact, the undisputed evidence overwhelmingly indicates that Winkler did not satisfy the definition of "disability" contained in the 2002 Policy:

     1. When Principal Life asked Winkler's treating neurologist, Dr. George M. Dmytrenko, "What current restrictions or limitations have you given him in regards to his ability to work full time in a sedentary position as a field agent," Dr. Dmytrenko wrote on September 27, 2004, "no restrictions." (Doc. 32:14, Ex. 5.)

     2. In a letter dated October 1, 2004, Dr. Dmytrenko indicated that Winkler had a "normal neurologic exam" and "minimal signs of myelopathy." Dr. Dmytrenko further indicated that "[Winkler] would have no restrictions as far as the actual functioning of his job. However, I continue to believe that a reduced schedule and a flexible schedule of where he has control of what he is able to do and when he is able to do it is best suited for this gentleman." Doc. 32:15, Ex. 6.)

     3. In a letter dated September 1, 2004, Dr. Edward J. Galbavy, a board-certified ophthalmologist, who had reevaluated Winkler on August 18, 2004 for vision problems experienced by Winkler earlier in his claim, wrote, "reevaluation of our mutual patient demonstrates stable visual acuity in each eye with full motility testing and no evidence for any double vision. Apparently this was a problem in the past which has since <u>resolved</u>." (Doc. 32:17, Ex. 6) (emphasis added.)

     4. A functional capacity examination (FCE) that was conducted on November 11, 2004, indicated that Winkler was likely able to work a full eight hour day at a "medium" level of activity. Winkler's position as a financial planner is considered to be sedentary in nature, which is below the medium level. (Doc. 32:18-23, Ex. 8; Doc. 32:1, Ex. 9.)

     5. On November 30, 2004, Principal Life submitted Winkler's clinical information and the results of the FCE to board certified neurologist, Dennis Nitz, for a second

opinion concerning Winkler's functional abilities. Dr. Dmytrenko also received the results of the FCE. Dr. Nitz and Dr. Dmytrenko conferred by telephone. Both Dr. Nitz and Dr. Dmytrenko agreed with the results of the FCE. Dr. Nitz wrote that

> Dr. Dmytrenko agreed with the FCE report and states it validated his impression. He states the patient has always been consistent during his follow-up visits reporting a need for short rest periods while working due to his fatigue. A consensus regarding his work is that he should be allowed a 15-minute rest period every two (2) hours *while performing his current job*.

(Doc. 32:1-2, Ex. 9) (Emphasis added.)

6. When Principal Life informed Winkler's attorney that it intended to perform an occupational analysis to assess the skills necessary to perform the duties required of a financial planner, Winkler's ability to perform those duties, and the availability of other employment for which Winkler was qualified based on his education, training, or experience, Winkler's attorney responded on May 17, 2005, that

> Mr. Winkler is not claiming that he cannot work or that there are not jobs in the area for which he is capable. The issue is that he is only capable of working a reduced number of hours due to extreme fatigue . . . he is performing the Substantial and Material Duties of his Own Occupation or any occupation on a Modified Basis and is unable to earn more than 80% of his Indexed Pre-disability Earnings.

(Doc. 30:29, ADR 429.) In her letter, Winkler's attorney thus admits that Winkler is capable of "performing the substantial and material duties of his own occupation or any occupation." Clearly then, Winkler does not qualify for additional disability benefits under the definition of "disability" contained in the 2002 Policy.

7. The occupational analysis, transferrable skills analysis, and labor market survey conducted by Principal Life confirmed that the occupation of financial planner is largely sedentary in nature and that financial planners can often set their own schedules, thereby accommodating Winkler's need for breaks. The assessments also identified other sedentary occupations related to financial planning for which Winkler was qualified based on his education, training, or experience. Several companies in the Pensacola area indicated that they were even willing to accept a resume for the position

of financial planner from an applicant who would require breaks. The companies indicated that such an applicant, if hired, would still be considered a full-time employee despite taking breaks. (Doc. 32:1-35.)

      8. Winkler asserts that his Indexed Predisability Earnings were determined to be $14,170.97 per month and that his 2004 actual earnings were $8,179.00 per month. (Doc. 33:13.) Although Winkler's earnings have substantially decreased because of his affliction, his 2004 actual earnings nevertheless represent approximately 57 percent of his Indexed Predisability Earnings. In addition, Winkler contends that he is able to work on a part-time basis of approximately five to six hours each day. (Doc. 33:13.) Synthesizing this information, it is apparent that Winkler is earning more than half of his predisability earnings and that he is working between 62.5% and 75% of an eight-hour work day. Construed in the light most favorable to Winkler, these figures simply do not permit the conclusion that Winkler is unable to "perform the majority of the substantial and material duties" of either his own occupation or "any occupation for which he . . . is or may reasonably become qualified based on education, training or experience."

      It is apparent from the evidence before this Court that the disease afflicting Mr. Winkler has significantly impacted his personal and professional life. As part of his employment with First Command, Mr. Winkler was provided disability benefits. However, the disability benefits afforded Mr. Winkler are only as great or as small as the agreement that was entered into between First Command and Principal Life. The contract applicable to Mr. Winkler's claim provided for long-term disability benefits only under very narrow circumstances. After November 30, 2004, Mr. Winkler failed to qualify as "disabled" under the terms of the 2002 Policy. Although the 2002 Policy was later amended and the definition of "disability" broadened, this broader definition was offset by restricting the class of employees covered by the 2003 Policy to full-time employees who regularly work at least thirty hours per week. This trade-off was part of the business judgments and dealings between First Command and Principal Life. This Court is not empowered, nor would it be fair to Principal Life, to rewrite the terms of the Policy for the benefit of Mr. Winkler.

### III.  CONCLUSION

1.  Plaintiff's Motion for Summary Judgment (Doc. 33) is denied.

2.  Defendant's Motion for Summary Judgment (Doc. 31-1) is granted.

3.  Defendant's Unopposed Motion to Appear By Telephone At Pre-Trial Conference (Doc. 37) is denied as moot.

4.  Defendant's Motion to Supplement Administrative Record (Doc. 42) is denied as moot.

5.  The pretrial conference scheduled for Monday, April 24, 2006, is cancelled.

6.  The clerk shall enter judgment dismissing Plaintiff's claims with prejudice.

7.  The clerk shall close the file.

**ORDERED** on April 19, 2006.

        **/s/ Richard Smoak**
        **RICHARD SMOAK**
        **UNITED STATES DISTRICT JUDGE**